[No. 27263.   *En Banc.*   August 9, 1938.]

THE STATE OF WASHINGTON, *on the Relation of Jos. H. Wohleb, Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

*E. W. Anderson,* for relator.

*The Attorney General* and *Harry L. Parr, Assistant,* for respondent.

*George F. Yantis, amicus curiae.*

BEALS, J.—Relator filed in this court his application for a writ of mandate, directed to respondent as auditor of the state of Washington, requiring respondent to pay a voucher in the sum of two hundred dollars, drawn by relator, covering relator's bill for services rendered pursuant to a resolution of the state capitol committee (hereinafter referred to as the committee), relator's services consisting of the making of a preliminary survey and study to assist the committee in fixing the site of an additional office building, to be

[1]Reported in 81 P. (2d) 864.

erected as an additional unit of the capitol group of buildings. Relator alleged that he had rendered the services under instructions from the committee, and that respondent had refused to pay the warrant.

Upon the filing of relator's application, supported by his affidavit, an order was entered requiring respondent to appear at a time and place fixed in the order, and show cause why a writ of mandate should not issue as prayed for by relator. Respondent appeared and demurred to the application, at the same time, without waiving his demurrer, filing his answer. The parties appeared at the time and place fixed in the order, and the matter was submitted to the court for final determination upon briefs and oral arguments.

The legislature of 1937, in its general appropriation act (Laws 1937, chapter 230, p. 1179), appropriated from the general fund $300,000, and from the capitol building construction fund $165,000, for the "construction of additional unit to the capitol group, including preparation of site and removal of old buildings." Laws of 1937, chapter 230, p. 1194. It appears that the Federal public works administration has made a grant in the sum of $487,227, to be used with the amount appropriated by the state legislature, as above set forth, in the construction of the building referred to. The committee, by resolution regularly adopted, authorized the construction of the new building upon the site described as

". . . a section of a vacated area of Williams Addition to the city of Olympia, described as block 85 and bounded on the north by 11th avenue, on the west by Water street extended, on the south by 12th avenue extended, and on the east by Columbia street extended."

The services rendered by relator consisted of preliminary surveys and studies in connection with the

location of the proposed building on the site selected by the committee. Respondent contends that, under the general law and the appropriation by the legislature, by way of the provision of the appropriation act of 1937, above quoted, the committee has no lawful authority to locate the new building on the site which it has selected, and that the building must be constructed on a site in "Capitol Place," southwesterly of the capitol building, and near the southwest corner of Capitol Place.

Prior to 1911, the state capitol commission, a board established by statute, had general charge of the site for the proposed state capitol, owned by the state, in the city of Olympia, and of all matters in connection therewith. By Laws 1909, Ex. Ses., chapter 20, p. 58, Rem. Rev. Stat., § 7905, the state capitol commission was given power, in the name of the state, to acquire by gift, donation, purchase, or condemnation, for capitol building purposes, certain property adjoining the "old capitol site," which, many years before, had been given to the territory of Washington for its capitol buildings. The legislature of 1911, by Laws of 1911, chapter 59, p. 319, fixed the powers of the commission, and by § 1 of the act (Rem. Rev. Stat., § 7906 [P. C. § 6275]) provided, *inter alia,* for the acquisition of certain property (the land described by Laws 1909, Ex. Ses., chapter 20, above referred to), and for the use of such lands in conjunction with the lands already belonging to the state,

".  .  . for the erection and building thereon of a group or system of buildings for capitol purposes, .  .  . all of which grounds or land shall hereafter be known as 'Capitol Place'."

By the same section, the construction of the capitol building and another building to be known as the "Temple of Justice" was authorized. Construction of

still other buildings was referred to in the section, such buildings "to be grouped around and adjacent to said 'Capitol' and to be built from time to time as needed."

By the fifth subdivision of § 1, above referred to, the commission was directed to prepare complete topographic and profile maps of the lands composing Capitol Place, and to receive ground plans for a series or group of buildings to be erected on Capitol Place, "showing the main building or 'Capitol,' a court building or 'Temple of Justice' and at least two other buildings for general offices." It was provided that the commission might adopt a plan and do all things necessary to carry out the purposes and intent of the act,

". . . to the end that, as speedily as consistent with economy, suitable, adequate, and commodious buildings and grounds may be provided for official purposes, and that to this purpose, from time to time, new buildings, or additions to buildings theretofore constructed, except additions to the main building, may be constructed, all in accordance with a general plan, and so as not to interfere with the symmetry, grandeur, or architectural beauty of the whole system or group."

In due time, the commission received and considered a number of ground plans, and accepted one prepared by a firm of New York architects, in accordance with which all of the existing buildings comprising the capitol group (with the exception of one known as the Highway building) have been erected. Four buildings have been constructed in accordance with the accepted general plan, the last one built being known as the Public Lands-Social Security building, located to the south and a little east of the Capitol building. The plan shows another building, corresponding to the one last mentioned, to the south and a little west of the Capitol building. The remaining building shown by the plan, but not yet constructed, balances the Insur-

ance building, and if constructed pursuant to the plan, will stand to the west of the Capitol building.

It appears that, subsequent to the enactment of the 1911 statute, other lands lying to the east and north of those described as Capitol Place have been acquired by the state for use in connection with the capitol group. The Highway building has been constructed on a portion of the land so acquired.

By Laws of 1921, chapter 7, p. 12, known as the administrative code, many state administrative departments and committees were established, § 8 of the act providing that the governor, state auditor, and commissioner of public lands, *ex officio*, shall constitute the state capitol committee, which shall exercise all the powers theretofore exercised by the state capitol commission. Since 1921, the committee established by the act referred to has exercised control over the capitol grounds.

The question to be here determined is whether or not the committee has authority to direct that the proposed new building or unit of the capitol group be erected upon the site above described, which lies without the lands designated by the legislature as Capitol Place, title to such proposed site having been acquired by the state after the enactment of the statute of 1911. This proposed site is not designated as a building site upon the map, above mentioned, showing the ground plan of the capitol group of buildings.

Laws of 1917, chapter 167, p. 776, refers to the capitol buildings and grounds, the powers and duties of the state capitol commission, and the issuance and sale of bonds. Section 5 of this act, p. 777 (Rem. Rev. Stat., § 7915 [P. C. § 6293]) reads as follows:

"That the state capitol commission shall have power to amend or modify any of the plans and specifications heretofore authorized or adopted, or to adopt new

plans and specifications for the location, construction and completion of buildings on the state capitol site, and may advertise for competitive plans."

Relator strongly relies upon the section last quoted, contending that, under that section and other sections establishing the committee and defining its powers, the committee has lawful authority to select the site which it has chosen for the proposed new building.

A reproduction of the plan of the buildings which had been constructed prior to 1928, and showing the location of the buildings which it was then contemplated would be erected in the future, is in evidence. This generally follows the plan adopted long prior to 1928. One of these latter buildings—the Public Lands-Social Security building—has been erected on a site indicated for a building.

In addition to contending that by § 7915, *supra*, the committee is vested with authority to select the location of the new building, relator argues that the committee's act does not contravene the general plan or scheme above referred to, and that subsequently the buildings contemplated in that plan may be erected in accordance therewith. Relator also argues that the site which the committee has selected is "adjacent" to the Capitol, and that the word "around," as used in § 7906, subd. (C), *supra*, is a flexible term, meaning simply in the vicinity of.

Relator also argues that the courts will not control the action of an executive or administrative body in the exercise of discretionary power, which principle is well established by authorities with which we are in hearty accord.

It clearly appears that the plan for improvement of the tract, designated, some years since, by the legislature as Capitol Place, and the lands which have since been added thereto, has been well established and

quite consistently followed. The legislature, of course, knew of this plan, and in appropriating money for the construction of the building about to be erected, we are convinced, intended to follow it, and provide for a building to be placed upon a site indicated in the plan. It is admitted that the site which the committee has selected for the new building bears no buildings whatsoever, and that one of the remaining sites shown on the plan, and the site which would logically be considered for the next building, if that plan be followed, does contain some structures which must be removed, if a new building be built there.

We are of the opinion that, under the appropriation above quoted, contained in Laws of 1937, chapter 230, it must be held that the legislature has itself fixed the location of the new building, and that the committee has no authority to direct that this building be constructed on any site other than one indicated on the general plan. The legislature appropriated money for the "construction of additional unit to the capitol group, including preparation of site and removal of old buildings." The legislature, of course, had in mind the capitol group as already constructed, and as shown on the plan, two of the buildings contemplated thereby being still unbuilt. This is made doubly sure by the fact that the appropriation includes "removal of old buildings," in addition to the preparation of the site, which would probably be necessary in any case.

The legislative direction that a unit be added to the capitol group indicates an adherence to the plan, and it does not appear that the capitol committee, prior to the legislative appropriation, had ever changed or suggested any change in the location of the remaining buildings which had not yet been constructed.

Careful consideration of the record convinces us that, by the appropriation act, the legislature has itself fixed

the location of the new building to be constructed in accordance with the group plan, and that the state capitol committee has no authority to change the location of this building, but must select one of the sites indicated by the plan.

The writ is accordingly denied.

ALL CONCUR.