[No. 35256. *En Banc.* October 20, 1960.]

THE STATE OF WASHINGTON, *Appellant*, v. INTERNATIONAL TYPOGRAPHICAL UNION *et al., Respondents.*[1]

[1]Reported in 356 P. (2d) 6.

*The Attorney General* and *Elvin J. Vandeberg, Special Assistant,* for appellant.

*Bassett, Davies & Roberts* (*Richard P. Donaldson,* of counsel), for appellants Olympia Printing Pressmen and Assistants Union *et al.*

*Paul D. Jackson,* for respondents.

DONWORTH, J.—This action arose out of a jurisdictional dispute between the Olympia Printing Pressmen and Assistants' Union, Local 182 (hereinafter referred to as the pressmen's union), and the Olympia Typographical Union,

Local 142 (hereinafter referred to as the typographical union), with respect to the operation of the photo-offset equipment in the state printing plant.

Neither union had any written collective bargaining agreement with John C. Gregory, the Public Printer of the state of Washington. However, both unions had written contracts with the commercial printing plants in downtown Olympia. With respect to wages and hours, Mr. Gregory had orally negotiated with each union on an annual basis. With respect to other working conditions, he had generally abided by the terms of the collective bargaining agreements covering the downtown Olympia plants.

In the fall of 1957, Mr. Gregory introduced photo-offset equipment to the state printing plant. Both unions demanded jurisdiction over the photo-offset work. Mr. Gregory, having always felt both legally and morally bound by the provisions relating to the working conditions contained in the agreements covering the downtown plants, examined the downtown contracts of both unions. Upon the basis of this examination, he assigned the photo-offset work to the typographical union.

The pressmen's union strongly objected to such assignment and claimed that, under the terms of its downtown contract, it was entitled to jurisdiction over the photo-offset equipment. In an effort to resolve the conflict, the Governor selected an impartial fact-finding committee to make an investigation and recommend which union should be given jurisdiction.

On December 22, 1958, after conducting hearings at which both unions were given an opportunity to present evidence and argue their respective positions, the committee recommended to the Governor that the pressmen's union be assigned jurisdiction over the photo-offset work.

In accordance with the committee's recommendation, the Governor requested Mr. Gregory to reverse his initial assignment and reassign the work to the pressmen's union. On January 10, 1959, Mr. Gregory complied with the Governor's request. As a result thereof, members of the typo-

graphical union walked off the job and began picketing the state printing plant.

The state of Washington then brought an action against the typographical union praying for injunctive relief against the strike and the picketing. The trial court granted a temporary restraining order on January 12, 1959. On January 19, 1959, the trial court entered a temporary injunction enjoining picketing by the typographical union. The cause was then set down for trial upon the merits as to whether a permanent injunction should issue.

The typographical union filed an answer and cross-complaint to the state's complaint. The cross-complaint alleged that Mr. Gregory was breaching his contract with the typographical union by assigning the offset work to the pressmen's union and prayed for a decree of specific performance compelling Mr. Gregory to assign the photo-offset work to the typographical union.

The matter was tried to the court, sitting without a jury, on April 16 and 17, 1959. At the conclusion of the trial, the court took the matter under advisement. On May 5, 1959, the trial court filed a memorandum opinion upholding the right of the typographical union to strike the state printing plant, dismissing the state's complaint, and dissolving the temporary injunctive relief. The trial court did not pass upon the merits of the typographical union's cross-complaint at that time.

The morning of May 18, 1959, the pressmen's union filed a motion to reopen the cause and for leave to file a complaint in intervention. This motion was based upon the affidavit of Mr. E. M. McNelly, the union's president. Later the same morning, the trial court signed findings of fact, conclusions of law, and a decree granting jurisdiction over the photo-offset work to members of the typographical union. The findings, conclusions, and decree were filed on the same date.

On the afternoon of May 18, 1959, a copy of the court's decree was served upon Mr. Gregory. The next morning (May 19, 1959) Mr. Gregory removed John Burton, a member of the pressmen's union, from the offset work and assigned the work to a member of the typographical union.

When this occurred, the members of the pressmen's union immediately ceased work for the purpose of holding a meeting. Present at this meeting was Mr. William Nickinovich, a representative of the International Printing and Assistants' Union of North America, AFL-CIO, of which the pressmen's union is an affiliation. He had come from Seattle to attend the meeting. The union members stated their intention of declaring a lockout. Mr. Nickinovich advised them that, pursuant to the union's constitution, this would require a majority vote by secret ballot. After conducting a vote on this question by secret ballot, the result was that a majority were in favor of a lockout, so the members of the pressmen's union walked out of the printing plant and began picketing.

May 22, 1959, counsel for the pressmen's union appeared before the trial court and requested that a time be set to hear its motion to reopen the cause and for leave to file a complaint in intervention. The trial court indicated that a hearing would not be necessary and thereupon denied the motion.

May 28, 1959, Mr. Gerald Hagan, acting for the Governor, instructed Mr. Gregory to close the camera room and to cease operating the plate-making facilities used in the photo-offset process. Mr. Hagan advised the pressmen's union that the camera room, where the offset work was performed, had been closed down, and urged the members to return to work. The members of the pressmen's union thereupon returned to work June 1, 1959.

On the evening of June 1, 1959, Mr. Nickinovich was served with papers requiring him to appear and show cause why he should not be held in contempt of court. Mr. E. M. McNelly, Mr. Gregory, and Mr. Hagan were likewise served with similar orders.

These parties appeared on June 5, 1959, and again on June 8, 1959, for hearing. They all filed motions to quash the orders to show cause, which were denied. The proceedings were dismissed as to E. M. McNelly at the request of the typographical union.

At the conclusion of the hearing, the trial court rendered

an oral decision finding Mr. Gregory, Mr. Hagan, and Mr. Nickinovich guilty of contempt. On June 11, 1959, a formal order was entered adjudging them each to be in contempt of court.

The trial court stated that it would withhold the imposition of any penalties pending the result of the appeals to this court.

The pressmen's union has appealed from the order of the trial court denying it leave to intervene.

Mr. Gregory, Mr. Hagan, and Mr. Nickinovich each have appealed from the trial court's order adjudging them to be in contempt of court.

On November 4, 1959, the chief justice entered an order directing that the various appeals in this matter be consolidated for hearing in this court.

We deem it advisable to note at the outset that none of the appeals raise the question of the right of a union to strike or picket against the state, or of the power of the Public Printer to bind the state by the agreements described herein, and we express no opinion thereon.

The pressmen's union's sole assignment of error is that the trial court erred in denying its motion to reopen the cause and for leave to file a complaint in intervention.

The typographical union contends that the case is now moot, in that its agreement with the state has expired by its own terms.

The agreement referred to consists of an oral promise by Mr. Gregory that, with respect to matters other than wages and hours, he will observe from time to time the provisions of the existing contract between the typographical union and the downtown Olympia printing shops.

In finding of fact No. 6, the trial court found that this was an *annual* agreement. In finding of fact No. 8, the trial court found that the agreement then in effect had been negotiated in September, 1957, and renegotiated in September, 1958. Conclusion of law No. 3 reads:

"The agreement in existence at the first occurrence of these events, and the agreement now in existence, are not

within the Statute of Frauds, since by their *terms* they are *yearly* agreements and are negotiated *yearly*." (Italics ours.)

The findings of fact and conclusions of law (to which no error has been assigned) make it abundantly clear that the rights of the typographical union in the premises are based upon an *annual* agreement between the public printer and the typographical union.

The record is devoid of any evidence tending to show that the typographical union's agreement involved in this case was renegotiated in September, 1959; nor is any such contention made by either party. In so far as the record discloses, that agreement expired in September, 1959.

Thus, the question of whether or not the typographical union is entitled to representational jurisdiction over the photo-offset equipment is now moot in that the question does not rest upon existing facts or rights. *Thomas v. Van Zandt*, 56 Wash. 595, 106 Pac. 141 (1910). This, in turn, renders moot the question of the right of the pressmen's union to intervene in such cause. This court will not take jurisdiction to decide moot cases. *Hansen v. West Coast Wholesale Drug Co.*, 47 Wn. (2d) 825, 289 P. (2d) 718 (1955). Accordingly, the appeal of the pressmen's union must be dismissed.

The appeals of Mr. Gregory, Mr. Hagan, and Mr. Nickinovich may be disposed of together. All three appellants assign as error, *inter alia*, finding of fact No. 3, which reads:

"That the said Gerald Hagan, John Gregory, and William Nickinovich, and each of them, had knowledge of the decree of this court of May 18, 1959, and with such knowledge *effectually thwarted obedience* to said decree, and that such action was wilful and contumacious." (Italics ours.)

Although this statement is more in the nature of a conclusion of law than a finding of fact, it is the basis of the trial court's order adjudging appellants to be in contempt of court. Thus, regardless of how such statement is characterized, the question of the propriety of the trial court's contempt order depends on its validity.

That portion of the trial court's decree of May 18, 1959, material to our consideration herein, reads as follows:

" . . . the Public Printer of the plaintiff is hereby directed to proceed immediately to carry out Section 4 of the Agreement between plaintiff and OLYMPIA TYPOGRAPHICAL UNION No. 142 by assigning representational jurisdiction to the OLYMPIA TYPOGRAPHICAL UNION over all employees of the State Printing Plant who do any offset or lithographic work prior to the offset platemaking."

The nature of this proceeding is clearly described in the opening paragraph of the trial court's oral decision, which reads as follows:

"It is necessary to review very briefly what has gone in before in these proceedings. In the first place, it is necessary to remind ourselves again that this is an equity proceeding and is one in which the inherent power of the Court to compel obedience to its decree lawfully entered is involved. It is not a criminal contempt; it is not even a contempt under the ordinary civil statutes; it is a petition addressed to the chancery powers of the Court, inviting it, if it so finds, to *enforce its decree where the decree itself is alleged to have been violated.*" (Italics ours.)

■ This being a proceeding to *enforce* the trial court's decree, the applicable rule is found in the leading case of *Terminal R. Ass'n of St. Louis v. United States,* 266 U. S. 17, 69 L. Ed. 150, 45 S. Ct. 5 (1924), wherein the Supreme Court of the United States stated:

"In contempt proceedings for its *enforcement,* a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought; and the facts found must constitute a plain violation of the decree so read. . . ." (Italics ours.)

■ Reading the decree in the light of the foregoing rule, we find that it does nothing more than direct the public printer (Mr. Gregory) to assign jurisdiction of the photo-offset work to the typographical union. The trial court found that this direction had been violated by Mr. Hagan and Mr. Gregory when they caused the camera room to be closed and the offset process to be discontinued at the state printing plant.

Their conduct (which the trial court found to be in vio-

lation of its decree) is set forth in the following excerpts from the trial court's oral decision:

"With respect to Mr. John Gregory, the situation is this: That with full knowledge of the Court's decree, he accepted directions from others and thereby violated the decree. . . .

"With respect to Mr. Hagan, who acted, the record shows, with full knowledge of the decree, the same situation obtains. He is the one who gave the directive which was obeyed by Mr. Gregory, and Mr. Hagan thereby became involved in the matter."

The "directive" referred to by the trial court is the order given by Mr. Hagan on May 28, 1959, whereby, at the request of the Governor, he instructed Mr. Gregory to close the camera room where the plate-making facilities used in the photo-offset process were housed. In other words, the trial court found that Mr. Hagan, in issuing the order of closure, and Mr. Gregory, in complying therewith, had violated the decree of May 18, 1959, and were thereby guilty of contempt.

We cannot agree. The decree of May 18, 1959, is clear and unambiguous. As we read it, it directs Mr. Gregory, as the Public Printer, to assign jurisdiction of the photo-offset work to the typographical union. He did just that. The closure of the camera room, where the offset equipment was located, did not violate the decree in any manner whatsoever, because the decree contained no command that such equipment be kept in operation.

Nor could the trial court properly have done so. The continuance or discontinuance of any function of the state printing plant is an administrative problem addressed to those state officers in whom the legislature has vested discretion to act in the premises. Such functions may not be controlled by the courts in the absence of statutory direction. In the absence of such legislation, the question of whether or not the state should operate photo-offset equipment is a matter lying solely within the discretion of the executive branch of the government. No pertinent statute has been called to our attention. We have held that courts cannot control the action of an executive or administrative

body in the exercise of their discretionary powers. *State ex rel. Wohleb v. Yelle*, 196 Wash. 26, 81 P. (2d) 864 (1938).

With respect to Mr. Nickinovich, the record is not clear as to what action on his part the trial court deemed to constitute a violation of its decree. The trial court stated in its oral decision that Mr. Nickinovich advised the union members that the court's decree was a violation of the union's contract with the Public Printer. We merely note parenthetically that the trial court's observation is based primarily upon inference rather than any express testimony to such effect by Mr. Nickinovich. (No other witness testified as to his activities.) However, the following statement from the trial court's oral decision appears to be the real basis of the contempt adjudication.

". . . certainly Mr. Nickinovich's connection with this matter imposes upon him the duty of advising the chapel meeting that the first concern was obedience to the Court's decree. . . ."

Conceding, for the purposes of argument, that Mr. Nickinovich was under such a duty, we still fail to see how any conduct on his part violated the trial court's decree. By going on strike, the pressmen's union did not violate the trial court's decree. Nor did their strike result in "effectually thwarted obedience" to the trial court's decree, as finding of fact No. 3 states. Mr. Gregory did not reassign representational jurisdiction over the photo-offset equipment to the pressmen's union as a result of the strike. On the contrary, such jurisdiction was maintained with the typographical union in accordance with the trial court's decree.

The strike did result in the shutdown by the state officers of the photo-offset printing process, but as we have already pointed out, this shutdown did not constitute a violation of the trial court's decree. Mr. Nickinovich testified that he advised the union members at the chapel meeting that, before they could strike or declare a lockout, they must conduct a vote by secret ballot in accordance with the union constitution. He testified unequivocally that he did not order or advise the members to strike; that this was a

matter beyond his authority and one which the union members had to decide for themselves by means of a secret ballot. Without belaboring the point any further, suffice it to say that we find nothing in the conduct of Mr. Nickinovich that can reasonably be termed a violation of the trial court's decree.

Appellants have attacked the contempt order on various other grounds, several of which raise serious doubt as to the validity of the order. However, since finding of fact No. 3 is without substantial evidence to support it, it follows that the order of the trial court (based on that finding) adjudging Mr. Gregory, Mr. Hagan, and Mr. Nickinovich to be in contempt of court must be reversed. We, therefore, do not reach the various other questions raised concerning the order's validity.

As previously noted, the appeal of the pressmen's union must also be dismissed.

It is so ordered.

ALL CONCUR.